**Opinion issued November 27, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00469-CV

_____

## IN THE INTEREST OF J.D.R.G., A CHILD,

---

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-64238**

---

## MEMORANDUM OPINION

This parental termination appeal involves one child (J.D.R.G.), whom the Texas Department of Family and Protective Services took into custody at seven months old. His mother argues that the evidence is factually and legally insufficient to support the trial court's conclusions that (1) she committed the predicate acts

required for termination and (2) termination was in her child's best interest. *See* TEX. FAM. CODE § 161.001(b). We disagree and affirm.

**Background**

On March 7, 2016, the Texas Department of Family and Protective Services ("the Department") received a referral for neglectful supervision of then seven-month-old J.D.R.G. ("J.D.R.G."). The referral expressed concerned about J.N.G.'s ("Mother's") mental state after she threw herself on the floor of an emergency room, yelled she was dying, and left J.D.R.G. alone in a hospital room. The Department investigated, met with Mother, and observed J.D.R.G. Mother told the caseworker that she did not have mental health issues that would affect her child and she did not wish to be involved with the Department. Mother was referred to Family Based Safety Services.

Soon thereafter, the Department received a second referral for neglectful supervision of J.D.R.G. Mother had been arrested at a church, where she had previously been asked to leave. Before she was arrested, Mother threw herself on the ground, "went into a fit," and yelled at law enforcement to kill her. J.D.R.G., who was with Mother at the time, was left in the care of a church member. Mother's conduct resulted in a trespass conviction.

Although the church member kept J.D.R.G. for some time, the member eventually informed the caseworker that she could no longer care for J.D.R.G.

2

because Mother threatened her, so she no longer felt safe. At a family team meeting, Mother and J.D.R.G.'s father[1] stated that they did not have any viable placement options for J.D.R.G.

The Department filed a petition for protection and conservatorship and for termination of both parents' parental rights. The Department was granted emergency temporary managing conservatorship of J.D.R.G. and he was placed with a foster family. Following an adversary hearing, the court appointed the Department temporary managing conservator.

The court then ordered Mother to follow a family service plan. The plan set forth services and classes required before J.D.R.G. could return home. The plan required Mother to participate in parenting classes; maintain contact with J.D.R.G. through visits; establish and maintain stable housing for at least six months; participate in a psychological evaluation and psychiatric evaluation and follow all recommendations; participate in individual counseling and follow all recommendations; and maintain contact with her caseworker.

Nearly two years later, after several status and permanency hearings, the case proceeded to a bench trial. During the trial, the court heard testimony from the following witnesses:

---

[1]     The trial court also terminated J.D.R.G.'s father's parental rights. He has not appealed that determination.

3

Janeka Russell. Janeka Russell, therapeutic case manager at Star of Hope, testified first. She explained that Mother initially qualified for a Star of Hope program that helps young women who have aged out of foster care and are expecting or have young children. While in the program, Mother could (and did) receive shelter, meals, and help applying for benefits.

Russell worked with Mother from October 2016 until February 2017, when Mother was terminated from the program after threatening Russell. In February 2017, Mother came to a meeting with Russell and wanted to discuss her "restriction" status, a punishment Mother experienced for failure to come to classes and for curfew violations. The restriction meant that Mother could not leave the building. Russell explained that she did not have the power to change the restriction. Mother then threatened Russell, prevented her from leaving the office or calling for help, and tried to start a fight. Russell attempted to call the front desk for help several times, but Mother hung up the phone each time. When Russell was finally able to call for help, she told the front desk to call 911, and Mother left her office. The police came but did not arrest Mother. Mother was terminated from the program, and Russell would not recommend that she be invited back.

Ramona Walton. Ramona Walton, Transitional Aged Youth and Family Services Manager at Star of Hope, testified that she asked Mother to leave after the incident with Russell. She explained that Star of Hope allowed Mother to return to

obtain her belongings, and when Mother did so, she angrily demanded to see other staff members. Walton said that although Mother attended some parenting and life skills classes, she did not complete either program.

Diana Schultz. Diana Schultz was, at the relevant time, the Department's Supervisor for Investigations. She explained that Mother threatened the caregiver in J.D.R.G.'s Parental Child Safety Placement, and the caregiver called Schultz to retrieve J.D.R.G. Mother denied threatening anyone.

Schultz also explained that Mother had a history with the Department. An initial report expressed concerns for J.D.R.G.'s safety, but the investigation was closed.

Mother. Mother testified on several topics. For one, she said that she currently took no medications for her depression except for fish oil. She said that her doctor told her she could take fish oil or prescribed medications, even though her medical records showed prescriptions for three medications and no fish oil.

Mother disclosed that she had two unplanned pregnancies while J.D.R.G. was in the Department's care. On the day she testified, she was five months pregnant; she also had a miscarriage in July 2017. She said that she was receiving prenatal care from a midwife. But she could not provide the last name of the midwife.

Mother testified that, in May 2016, she was held on a mental health warrant after going to the hospital with suicidal ideations then demanding to be released. She

5

admitted that she has had suicidal thoughts for years and frequently goes to the hospital. The thousands of pages of medical records evidence the frequency with which Mother visited hospitals.

As far as housing, Mother testified that she had lived in at least three different places with friends during the pendency of her case. She also lived at Star of Hope (the program discussed above) until she was terminated from the program. She said that she signed a lease for an apartment where she lived at the time.

As to her employment, she testified to minimal employment in the 23 months since her son was placed in foster care. She said that she worked at Luby's for six weeks and received one paycheck. She also said that she worked at Ike's BBQ, although she had no documentation to prove it. Finally, she testified that she worked for six weeks at a Harris County youth program.

Regarding therapy, she testified that she stopped seeing the Department-referred therapist because she found scheduling to be a "headache." She said she had a new therapist.

When asked about her criminal history, she admitted she had been charged with crimes on numerous occasions and she had been arrested and jailed twice since the Department became involved with J.D.R.G.'s care. She was arrested was due to the above-mentioned altercation at a church. She was also arrested for assaulting a former boyfriend, and she failed to attend court. In November 2017, she was charged

6

with making a false police report. Finally, she described an incident at a prior court date in which she said that police "escorted" her to the courtroom, but she admitted that she had been detained.

Mother testified that she believed she substantially complied with her service plan.

Davien Guidry. Davien Guidry, conservatorship worker for the Department, testified that she was the only caseworker to have worked on the case, and she had been working it for two years. She explained that Mother's family service plan was created with collaboration from the Department, her supervisor, the Department's attorney, Mother's attorney, a disability attorney, and Mother. Mother completed parts, but far from all, of her service plan.

As to housing, Guidry explained that Mother did not allow her to visit Mother's apartment, despite Guidry's numerous requests. Guidry viewed photographs, but she could not verify that they were accurate depictions of the property, and she did not know until Mother testified that Mother received assistance in paying for the apartment.

As to financial stability, Guidry testified that Mother never provided verification of her employment or financial assistance.

As to psychological assistance, Guidry explained the agency's concerns about Mother's behavior, anger, aggressiveness, and lack of control of her moods and

emotions. Mother was diagnosed with depression, A.D.H.D., and bipolar disorder. The agency paid for a specific service provider, Deblin Health, to provide extra assistance to Mother. And Mother's psychological evaluation recommended that she participate in regular psychological intervention and individual therapy. It also recommended completing parenting classes.

But Mother did not follow the recommendations from the evaluation other than completing parenting classes. For example, Mother did not complete individual therapy at Deblin Health. She voluntarily quit the program. When Guidry attempted to discuss other therapist options, Mother told her that she already had a replacement. But Guidry was never able to verify the therapist. In Guidry's opinion, therapy could have potentially addressed the agency's concerns about Mother's ability to parent and control her emotions. But without it, Guidry did not believe that Mother could cope with a toddler.

Guidry testified that she read over 2,000 pages of Mother's medical records. She estimated that Mother went to the emergency room three or four times a month during the two years J.D.R.G. was in care. Mother usually complained of stomach issues, disease concerns, or suicidal thoughts. Mother also asked for pregnancy tests.

Guidry also explained that Mother did not update her on life events, as required by the service plan. Mother never informed the caseworker that she had a miscarriage, and Mother did not tell the caseworker about her arrests in August and

November 2017. Mother had many angry outbursts at Guidry, including on the first day of trial, when Guidry had a bailiff escort her out of the building.

As far as visitation, Guidry testified that the agency paid for a therapist to accompany Mother to visits, but the therapist was not able to help during Mother's many angry outbursts. She explained that these outbursts sometimes happened in front of J.D.R.G., and he appeared scared when this happened.

Mother was a safety concern during visits. Her visits were monitored by two individuals, rather than one, so she could not make false allegations against caseworkers. Mother threatened Guidry verbally and physically. On a few occasions, she had to be escorted out of visitation.

Mother did not consistently maintain contact with J.D.R.G. When visits were scheduled, Mother frequently missed them or was very late. During a year and a half of weekly visits, Mother was significantly late 15 times and missed 10 visits. Each time, J.D.R.G. was ready for the visits, after traveling 30 minutes each way to attend. On visits she did attend, J.D.R.G. did not bond with her.

On a few occasions, the Department halted visitation because of various concerns. The first time, visitation stopped because of concerns of Mother's outbursts. The Department wanted to know what was causing them and if Mother was taking medication. Mother refused to show her caseworker any medications for months, and she had no visits for two or three months. On another occasion, she had

an outburst in front of J.D.R.G., and security escorted her out. On a third occasion, visits were stopped when the Department learned that Mother had a warrant for her arrest. Another time, Mother had to stay in a room while Guidry escorted everyone out because Mother continuously yelled at the foster parent.

The Department expressed concern about Mother's aggression and her altercations with a variety of people during the pendency of the case.

Foster Mother. J.D.R.G.'s foster mother testified that he had been in her care for about two-and-a-half years. She explained that he was developmentally behind when he arrived at her home at seven months old. But he worked to overcome those setbacks and became developmentally on target. J.D.R.G. bonded with Foster Mother's three other children and husband, and her husband's employment was stable. She testified that, if allowed to adopt J.D.R.G., they would treat him as their own child and provide for him beyond 18 years old.

Foster Mother described two incidents where Mother lashed out and frightened her and J.D.R.G. First, Mother came to Foster Mother's car before a visit and started yelling at J.D.R.G. Mother put her body on the car and both Foster Mother and J.D.R.G. were frightened. On a second occasion, Mother confronted Foster Mother at Star of Hope and yelled at her about filing taxes for J.D.R.G. J.D.R.G. became scared.

Mother's Witnesses. The court also heard from three witnesses for Mother. First, Kelly Opot of the Harris County Youth Collective testified that Mother was one of 11 fellows chosen to lead youth outreach. The court also heard from Adrianne Fontenot who testified that Mother lived with her for a month after J.D.R.G. was born. Fontenot was a professor at Lone Star College, and she was also a childbirth and breastfeeding educator. She testified that during the month in her house, Mother was attentive and affectionate to J.D.R.G. On cross-examination, Fontenot admitted that she did not know about Mother's suicide attempt or previous hospitalizations.

Finally, the court heard from Ingrid Wright, Mother's maternal aunt who testified that, although she lives in Lubbock, she would like to adopt J.D.R.G. She explained that as part of a risk assessment, the Department asked for her husband's criminal background in October 2017. She has two children with her husband, whom she met in 2000 but married in 2014 after he was released from prison. On cross-examination, she acknowledged that her husband's criminal record spanned from 1993 to 2014, and she understood the agency's trepidation with a 23-year criminal record. Nevertheless, she believed that people can have a change of heart. Her husband's criminal record was entered into evidence.

**Analysis**

On appeal, Mother asserts that the evidence was legally and factually insufficient to support the trial court's predicate findings regarding endangerment,

11

constructive abandonment, and failure to complete the service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(E) (endangerment), (N) (constructive abandonment), (O) (failure to comply with court-ordered service plan). She also disputes the trial court's determination that termination of her parental rights was in the child's best interest. *See id.* § 161.001(b)(2).

To terminate parental rights, the State must establish by clear and convincing evidence that there is at least one predicate statutory ground for termination and that the termination is in the child's best interest. *See id.* § 161.001(b); *see also In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

To assess legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. We assume that any disputed facts were resolved in favor of the finding as long as a reasonable factfinder could have done so. *Id.* If "no reasonable factfinder could form a firm belief or conviction" that the matter on which the State bears the burden of proof is true, then we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the factual sufficiency of the evidence, we

12

consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## A.    Predicate Ground

Mother argues that the evidence is legally and factually insufficient to support termination of her parental rights under section 161.001(b)(1)(O) because she complied with some requirements of the family service plan and those accomplishments were sufficient. We hold that Mother failed to comply with the court's order. *See* TEX. FAM. CODE § 161.001(b)(1)(O).

A trial court may terminate parental rights under Subsection O if (1) the Department has been the child's temporary managing conservator for at least nine months, (2) the Department took custody of the child as a result of an emergency removal for child abuse or neglect, (3) a court issued an order establishing actions necessary for the parent to obtain the return of the child, and (4) the parent did not comply with the court order. *Id.*; *see also In re K.N.D.*, No. 01-12-00584-CV, 2014 WL 3970642, at *6 (Tex. App.—Houston [1st Dist.] August 14, 2014, no pet.) (mem. op. on reh'g) (explaining a trial court may direct a parent to perform specific acts by ordering her to comply with a family service plan). A court may not order termination under subsection (O) if the parent proved by a preponderance of the

13

evidence that the parent was unable to comply with specific provisions of the court order, that the parent made a good faith effort to comply, and that the parent's failure to comply was not attributable to any fault on the part of the parent. TEX. FAM. CODE § 161.001(d).

Here, Mother does not challenge the fact that J.D.R.G. was removed for abuse or neglect under Chapter 262 or that J.D.R.G. was in the Department's care for over nine months. These unchallenged findings are binding on us "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *In re I.L.G.*, 531 S.W.3d 346, 353 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (quoting *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see also In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (Unchallenged findings of fact supported termination under section 161.001(1)(O) because record supported those findings.). The record supports each of the unchallenged findings.[2]

Mother argues that termination is improper because she substantially complied with the family service plan. The record does not support her contention.

The plan required Mother to:

- participate in parenting classes;

---

[2] The undisputed evidence showed that J.D.R.G. had been in the managing conservatorship of the Department for well over nine months and had been removed from Mother's care in an emergency proceeding due to abuse or neglect. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).

- maintain contact with J.D.R.G. through visits;

- establish and maintain stable housing for at least six months;

- participate in a psychological evaluation and psychiatric evaluation and follow all recommendations;

- participate in individual counseling and follow all recommendations; and

- maintain contact with her caseworker.

Mother did not substantially comply with this plan. To begin, the record shows that although Mother completed a psychological evaluation, she did not follow its recommendations, including taking medication for her depression and participating in regular individual therapy. There is no evidence that she completed the required therapy; instead, the evidence shows that she chose to stop working with the referred therapist.

Mother also failed to maintain regular contact with her caseworker. She did not update her caseworker on important occurrences, such as her arrests and her pregnancies.

Mother failed to verify her housing, employment, or finances. Although she submitted a lease, she refused to allow the caseworker to tour the apartment and verify who lived there or that it was a safe and structured home environment as required by the service plan.

15

In addition, although Mother admitted she had been diagnosed with depression, she failed to treat her mental illness, and she did not demonstrate stability and an ability to protect J.D.R.G. from harm. Mother's decision not to participate in therapy resulted in the Department having the same concerns about Mother at trial that it did when it removed J.D.R.G. from her care.

Mother likewise refused medication for her mental illness. Although a doctor had prescribed several medications, Mother testified that she took only fish oil. Even when Mother's visits with J.D.R.G. were discontinued due to concerns she was not taking medication, she refused to show her caseworker the prescribed medications for several months.

Mother also failed to attend many scheduled visits with J.D.R.G. Mother was late 15 times and cancelled 10 times. On several occasions she was so late that she missed most of the visit.

The trial court had discretion to judge the credibility of witnesses and to believe the Department's witnesses. *See J.F.C.*, 96 S.W.3d at 266 (We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so.). The record does not reflect that Mother substantially complied with the recommendations in her service plan. *I.L.G.*, 531 S.W.3d at 354. And the record does not show that Mother was unable to comply with specific provisions of

16

the court order, that she made a good faith effort to comply, or that her failure to comply was not attributable to any fault of her own. TEX. FAM. CODE § 161.001(d).

The Department presented clear and convincing evidence that J.D.R.G.'s removal was due to abuse or neglect, that the child had been in the Department's care for over nine months, and that Mother failed to substantially comply with the provisions of the trial court's order. Legally and factually sufficient evidence supported the trial court's finding made pursuant to subsection (O) of Section 161.001(b)(1). *See In re B.C.*, No. 11-18-00098-CV, 2018 WL 4624198, at *2 (Tex. App—Eastland Sept. 27, 2018, no pet.) (mem. op.).

## B. Best Interest

Before terminating parental rights, the Department must also establish by clear and convincing evidence that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). Only if no reasonable factfinder could form a belief or conviction that termination was in J.D.R.G.'s best interest can we conclude that the evidence is legally insufficient. *In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014).

There is a strong presumption that the child's best interest will be served by maintaining the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). But prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a). To determine whether termination of the parent-child relationship was

17

in the child's best interest, we evaluate the evidence in light of the factors set out in *Holley v. Adams*: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). The list of *Holley* factors is not exhaustive, nor is evidence of all nine factors required to support a judgment of termination. *Id.* at 372.

The Texas Family Code also sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment,

and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b); *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Here, legally and factually sufficient evidence supported the trial court's conclusion that termination of Mother's parental rights was in J.D.R.G.'s best interest.

**Child's Desires and the Stability of the Proposed Placement**

J.D.R.G. was very young at the time of trial, and we have no evidence of his desires. When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well cared for by them, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

No evidence suggests that J.D.R.G. bonded with Mother. Although Mother initially had weekly visits with J.D.R.G., she was frequently late and had loud outbursts (scaring him) when she attended, and she missed numerous visits. Her visits stopped completely in November 2017.

In contrast, evidence showed that J.D.R.G. was well cared for in his foster home and that his foster parents wished to adopt him. His development improved from lagging to on target, and he bonded with his foster parents and their children.

19

The evidence weighs in favor of the finding that termination is in J.D.R.G.'s best interest.

**Child's emotional and physical danger now and in the future**

A parent who lacks the ability to provide a child with a safe and stable home is unable to provide for a child's emotional and physical needs. *In re T.C.*, No. 01-17-00497-CV, 2018 WL 4126600, at *21 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, no pet.) (mem. op.); *see also In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.); TEX. FAM. CODE § 263.307(a), (b)(12)(D) (emphasizing child's need for prompt and permanent placement in safe environment). Evidence of Mother's residency is equivocal at best. Mother would not allow anyone from the Department to view her residence and verify that it was safe for a child. She also did not provide proof of her employment, testified only to recent employment, and did not demonstrate an ability to provide for herself and J.D.R.G. *See In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *10–11 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (parent who did not demonstrate she could provide safe and stable home was unable to meet children's needs). Mother was convicted of trespass, and she had two pending criminal charges as well. *See In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (parent's criminal

history considered in determining "present and future emotional and physical danger to the children").

In addition, Mother admitted having suicidal ideations, and she did not complete the service plan to address her mental health. She stopped attending therapy and taking medication to address her diagnoses, she went to the hospital multiple times a month throughout the pendency of the case, and she angrily lashed out at Foster Mother, her caseworker, staff at Star of Hope, and others, often in front of J.D.R.G. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[T]he trial court could have considered [the mother's] mental state [thoughts of hurting herself, mental health diagnoses, and seizures as endangering [the child's] well-being."); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence in concluding "when a parent's mental state allows [her] to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").

**The parental abilities of the individuals seeking custody, and acts or omissions of the parent**

J.D.R.G.'s emotional and physical needs have been met in his foster home. The foster parents want to adopt him, and he is bonded with them and their children.

21

In contrast, the evidence showed that Mother was unable to meet J.D.R.G.'s needs. *See In re C.J.*, No. 14-0700838-CV, 2008 WL 4447687, at *5 (Tex. App.—Houston [14th Dist.] July 10, 2008, no pet.) (mem. op.). Mother chose to terminate individual therapy with the therapist recommended by the Department, and she did not provide proof of additional therapy. She chose to stop taking her medication. Her outbursts and threats resulted in a loss of services, shelter, and stability at Star of Hope. Moreover, Mother provided no evidence of how she would financially provide for J.D.R.G. and she did not allow the caseworker to verify that her apartment offered him safe housing.

The caseworker testified that termination of Mother's parental rights was in J.D.R.G.'s best interest because Mother had done little to regain possession of him, and her lack of attention to her mental health meant that her situation had not improved. Mother offered some excuses (such as issues with transportation), but they do not rise to the level that no reasonable factfinder could have decided that termination was in J.D.R.G.'s best interest. *K.M.L.*, 443 S.W.3d at 116.

Considering all of the *Holley* factors and reviewing the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of J.D.R.G. Moreover, none of the disputed evidence was so significant that the factfinder could not have formed such a firm belief or

22

conviction. We therefore conclude that the evidence was both legally and factually sufficient to support termination of appellant's parental rights to J.D.R.G.

## Conclusion

We affirm the judgment of the trial court.


Jennifer Caughey
Justice

Panel consists of Chief Justice Radack and Justices Brown and Caughey.